Ronald William JACKSON,
(Reg. No. 17330–149),
Petitioner,

v.

Jack WISE, Warden, Federal Correctional Institution at Terminal Island,
Respondent.

No. CV 74–1967–IH(G).

United States District Court,
C. D. California.

Dec. 10, 1974.

On Supplemental Report and Recommendation Feb. 4, 1975.

**20**

Ronald William Jackson in pro per.

William D. Keller, U. S. Atty., for respondent, by Wilfred A. Hearn, Jr., Asst. U. S. Atty., Los Angeles, Cal.

IRVING HILL, District Judge.

Pursuant to Title 28 U.S.C. § 636(b) and General Order 104 of this Court, the United States Magistrate has reviewed the Petition filed herein for issuance of a writ of habeas corpus and has submitted the appended Report and Recommendation which is made a part hereof by reference.

The Court has reviewed the Petition for writ of habeas corpus and the Magistrate's Report and Recommendation. The Court, as will be seen hereinafter, adopts the Report, and the Findings and Conclusions therein contained, in some respects and rejects it in others. Whereas the Magistrate recommends that the Petition for writ of habeas corpus be immediately granted, the Court is unwilling to grant the Petition at once without receiving further information.

As will be seen from the Report and Recommendation, Petitioner is an incarcerated federal prisoner for whom the Board of Parole established a parole release date. Thereafter, the Board of Parole rescinded the said parole release date upon receipt of three incident reports from the Bureau of Prisons.[1] Each incident report found that Petitioner had engaged in misconduct as charged therein. The Board of Parole rescinded the parole release date without conducting its own investigation of the misconduct, acting instead solely in reliance upon the incident reports from the prison.[2]

■ The Magistrate has analyzed at great length the status to be afforded a prisoner when a parole release date has been fixed for him. Without endorsing all of the Magistrate's language and reasoning, I agree that the fixing of a parole release date for a prisoner affords him a substantial interest that may not thereafter be withdrawn except upon "minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the . . . right is not arbitrarily abrogated." Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

I regard the *Wolff* case, *supra*, as controlling in these circumstances although it dealt with good time as applied in a state prison system. The rationale of

---

1. At the time the Board of Parole acted to rescind the parole release date in this case, such act was authorized by 28 C.F.R. § 2.20 (1973), which read in pertinent part: "When an effective date has been set by the Board, release on that date shall be conditioned upon continued good conduct by the prisoner . . . ." Shortly after the rescission in this case, the relevant federal regulations were revised; the quoted language was retained, now as part of 28 C.F.R. § 2.30(a) (1974). Cf. note 5, *infra*.

2. As is more fully set out in the Magistrate's Report and Recommendation, the Board of Parole did hold an "institutional hearing on parole" approximately two months after the rescinded parole release date had passed. As a result of that hearing, a new parole release date was set. Cf. 28 C.F.R. § 2.-30(a) (1974); note 5, *infra*.

*Wolff v. McDonnell,* in my view, requires a similar result in the instant case. There is no legally significant distinction between the cancellation of earned good time and the cancellation of an established parole release date. The authority of *Sexton v. Wise,* 494 F.2d 1176 (5th Cir. 1974), holding that there are no due process requirements within the federal prison system for rescinding parole release dates, is undercut by *Wolff,* which was decided a month after *Sexton.* My conclusion requiring minimal due process procedures before rescinding or modifying a parole release date is also fortified by the decision of our own Circuit in *Clutchette v. Procunier,* 497 F.2d 809 (9th Cir.) (pre-*Wolff*), opinion modified, 510 F.2d 613 (9th Cir. 1974) (post-*Wolff*). *Clutchette* deals with prison disciplinary hearing procedures and imposes certain due process procedural requirements. Rescission of a parole release date, like prison disciplinary measures, impairs the "residuum of liberty" of the prisoner and should be governed similarly by due process requirements.

■■ I agree with the Magistrate's apparent holding that the due process requirements for the rescission or modification of a parole release date are less than those enunciated by the Supreme Court in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), as applicable to revocations of parole. In the absence of more precise guidance from a higher court, I also agree with the Magistrate that the due process requirements enunciated by the Supreme Court in *Wolff* should govern the revocation or rescission of parole release dates.[3] In summary, these are: (1) advance written notice of the charge; (2) a written statement by the factfinders of the evidence relied on and the reasons for their decision; (3) the right of the prisoner to be present; (4) the right of the prisoner to present witnesses and documentary evidence on his behalf, if so doing would not be "unduly hazardous to institutional safety or correctional goals" (*Wolff, supra,* at 566, 94 S.Ct. at 2979); (5) the right, if the prisoner is found illiterate or otherwise incompetent to protect his own interests, to have an attorney-substitute; and (6) adjudication of the charges by a panel sufficiently impartial to satisfy due process requirements.[4]

---

3. I find implicit support for this conclusion in *Wolff, supra,* at 563, 94 S.Ct. 2963 (text accompanying note 15), and in *Workman v. Mitchell,* 502 F.2d 1201 (9th Cir. 1974).

4. Requirement (6) is not clearly enunciated in the *Wolff* opinion, but in my view, is subsumed therein.

 In addition to the above six requirements, a panel of the Ninth Circuit in the modified *Clutchette* opinion of October 21, 1974, has added a further requirement for prison disciplinary proceedings, namely, the right to confront and cross-examine opposing witnesses. According to *Clutchette,* this right may be denied by the adjudicatory panel only upon a written explanation of reasons for the denial.

 With the greatest of respect, my own reading of *Wolff* is that it does not mandate the addition of this seventh requirement. In *Wolff,* the Supreme Court said with respect to confrontation and cross-examination that the "better course at this time . . . is to leave these matters to the sound discretion of the [prison] officials . . . ."

*Wolff, supra,* at 569, 94 S.Ct. at 2981. The Ninth Circuit panel in *Clutchette* implied from this statement that "the soundness of the discretion thus accorded could be subjected to [judicial] scrutiny." However, the clear holding of the Supreme Court with respect to confrontation and cross-examination is the statement: "We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination." *Wolff, supra,* at 568, 94 S.Ct. at 2980. This statement does not appear to admit of any judicially imposable exceptions.

 An understanding of the Supreme Court's treatment of confrontation and cross-examination is aided by an assessment of its treatment of the right to present witnesses, a right which the Supreme Court afforded inmates but made explicitly subject to the discretion of prison officials. The Supreme Court stated: "[T]he inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not

■ Within the federal prison system, there is a dichotomy of function and responsibility. The Bureau of Prisons has the duty of investigating and acting upon charges of misconduct within the prison, whereas the Board of Parole has the authority to fix parole release dates and to rescind or modify them after fixing. I depart from the Magistrate in his apparent holding that the Board of Parole must itself hold a *Wolff*-type due process hearing in cases like the instant one before rescinding a parole release date. It is my view that if a hearing meeting these requisites is held by either the Bureau of Prisons or the Board of Parole, it is sufficient. I feel that if an adequate hearing is held by the Bureau of Prisons, the Board of Parole may accept and act upon such hearing without a separate hearing of its own on the issue of misconduct.[5]

■ After the prison disciplinary proceedings upon which the Board of Parole acted in the instant case, the Bureau of Prisons adopted new procedures to be followed for adjudicating misconduct charges and imposing sanctions therefor. These procedures are set out in a document dated October 4, 1974, and entitled "Bureau of Prisons Policy Statement No. 7400.5C on Inmate Discipline." This policy statement delineates two kinds of institutional proceedings, the choice of which is dependent upon the sanction sought to be imposed. If the sanction sought is an order to place an inmate in disciplinary segregation, or to withhold or forfeit good time, or to transfer an inmate for disciplinary reasons, the power to act is vested in an Institution Discipline Committee. The Committee may impose such serious sanctions only upon following certain prescribed hearing procedures. If a lesser sanction is sought, on the other hand, it may be imposed by designated persons pursuant to another set of hearing procedures; the Bureau of Prisons policy statement refers to this latter type of institutional proceeding as a "minor disposition."

I have examined the hearing procedures required for the imposition of the above listed serious sanctions and find them to meet the requirements of *Wolff, supra,* as adopted in this case. Thus, in the instant case, if such procedures had

be unduly hazardous to institutional safety or correctional goals. . . . Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority . . .." *Wolff, supra,* at 564, 565, 94 S.Ct. at 2979. It is not clear even that the discretion to deny inmates the right to present witnesses is judicially reviewable. (I note, for example, that the Supreme Court specifically declined to require of prison offials any statement, either oral or written, as to their reasons for the denial. See *Wolff, supra,* at 565, 94 S.Ct. 2963.) But it is quite clear from the different treatment by the Supreme Court of the right to present witnesses, on the one hand, and the procedures of confrontation and cross-examination, on the other, that the Supreme Court did not intend to impose any judicially enforceable exceptions to the discretion of prison officials to forgo these latter procedures. · The use of the term "discretion" in the context of confrontation and cross-examination should be construed only as encouragement to prison officials by the Supreme Court to experiment with such procedures when and if it is appropriate.

5. Cf. *Wolff, supra,* at 563, 94 S.Ct. 2963; *Workman, supra,* 502 F.2d at 1210–1211; 28 C.F.R. § 2.29 (1974). I am cognizant of the regulation at 28 C.F.R. § 2.30, which was made applicable to our Region on July 1, 1974. Section 2.30(a) makes it clear that release on a prospective parole release date *is conditioned upon continued good conduct* by the prisoner. As I have said in the body of this memorandum, a *Wolff*-type hearing conducted by the Bureau of Prisons may *conclusively establish a lack of* "continued good conduct." The regulation, however, requires the Board of Parole to have a "hearing" of its own in the institution if the parole release date is retarded for more than 60 days because of the misconduct. That hearing of the Board is required to be in accordance with 28 C.F.R. § 2.12 (1974). A § 2.12 hearing is not designed to adjudicate or readjudicate the charges of misconduct. It is far less formal than a *Wolff*-type hearing and is designed to give the prisoner an opportunity to furnish some additional information and generally to be heard on the question of whether the parole date should be further retarded or rescinded, and for how long. Cf. 28 C.F.R. § 2.18–.23 (1974).

been in fact followed as to any of the three incident reports, I would be of the clear opinion that the Petitioner is not entitled to a writ of habeas corpus.[6] What is unclear in the instant case is whether such procedures were fully followed in any or all of the three Bureau of Prisons disciplinary proceedings. The evidence before us indicates that some of the requisites were followed in each instance. In each instance, there was a written notice of the charges served upon the Petitioner. It is also arguable that in two of the three instances Petitioner was served after the adjudication with a statement of the reasons for the action sufficient to satisfy the second requirement of *Wolff*. But the record is silent on whether the other requisites listed above were afforded the Petitioner. Unfortunately, the facts necessary to tell whether any or all of these institutional hearings met the *Wolff* standards have not been developed in this case up to this time. Therefore, it is ordered as follows:

The case is remanded to the Magistrate with instructions to obtain from the Government or the Petitioner (or such other sources as may be available), information as to whether the necessary procedures outlined above were followed by the Bureau of Prisons in any or all of the three disciplinary proceedings. If it is determined that the requisite procedures were not followed in connection with any of the three incidents, then a writ of habeas corpus should be granted.

■ In all candor, I should place on the record the fact that while this matter was pending before the Magistrate, the Board of Parole established a new parole release date of December 16, 1974, for the Petitioner. That date will undoubtedly have come and gone by the time the Magistrate can act upon this remand. The release of Petitioner on parole will render the case moot. Yet the Court feels that the important point of law discussed herein (which is apparently a first impression question since *Wolff* was decided) merits rendering and publishing this decision at this time.

## ORDER ADOPTING SUPPLEMENTAL REPORT AND RECOMMENDATION AND GRANTING WRIT OF HABEAS CORPUS

By Order filed December 10, 1974, the Court remanded to the Magistrate for further proceedings the instant Petition for Writ of Habeas Corpus. The Magistrate, in the Order of Remand, was instructed to determine whether the necessary due process procedures attending prison disciplinary proceedings and the revocation of a prospective parole date had been followed with respect to the Petitioner in three separate prison disciplinary proceedings. As stated in the Magistrate's Report and Recommendation, the Petitioner had been granted a prospective parole release date of June 12, 1974. That parole release date was revoked based upon three prison disciplinary proceedings involving incidents on April 18, 1974, April 24, 1974, and May 16, 1974.

The Court has now received from the Magistrate a Supplemental Report and Recommendation which is ordered filed contemporaneously herewith. In the Supplemental Report, the Magistrate reports that the Government concedes

---

6. I note also that the procedures set out in the Bureau of Prisons policy statement for "minor dispositions," i.e., for the imposition of lesser sanctions, do not appear to conform to the *Wolff* requirements in at least one significant respect. The inmate is not given the opportunity to present witnesses on his behalf at such proceedings. See Policy Statement No. 7400.5C, *supra*, at 9. There is also no assurance on the face of the policy statement that the person adjudicating the charge and imposing the sanction will satisfy the due process requirement of impartiality. For these reasons, incident reports that are the product of "minor dispositions," as that proceeding is defined in Policy Statement No. 7400.5C, *supra*, may not be the basis for rescission or modification of a parole release date by the Board of Parole. The Board of Parole would have to hold the requisite *Wolff*-type hearing itself, or request the Institution Discipline Committee at the particular prison to do so, as a predicate for rescission or modification.

that none of the three said proceedings was conducted in accordance with the basic due process requirements enunciated in the Order of December 10, 1974. The Court finds, in accordance with said concession, that such was the case. Such finding, under the terms of the Order of December 10, 1974, requires an immediate grant of a Writ of Habeas Corpus. As stated at page 5, line 27–29 of the December 10, 1974 Order: "If it is determined that the requisite procedures were not followed in connection with any of the three incidents, then a writ of habeas corpus should be granted."

The Court is informed of an additional complication in the matter: two additional incident reports apparently were written as to this Petitioner on December 3, 1974, and Petitioner allegedly was afforded in connection with such new incident reports, all of the necessary due process procedural requirements. The Court is further informed that on December 13, 1974, the Parole Board issued an order retarding the Petitioner's release, which had been scheduled for December 16, 1974. The date of February 19, 1975, was set by the Board for consideration of a possible new release date.

■ In the Court's view, it has now been determined that Petitioner was entitled to be released on the original scheduled parole release date of June 12, 1974. He must now be released, regardless of the new incident reports and procedures followed in connection therewith. His entitlement to release on parole which was complete as of June 12, 1974, cannot be affected by his subsequent conduct in prison while he was litigating what is now determined to be an unlawful deferment of that release date. Of course, he may be prosecuted civilly for any crime that he may have committed in prison between June 12, 1974, and the date of his actual release pursuant to the Writ of Habeas Corpus herein granted. Proceedings within the prison concerning the alleged incident reports of December 3, 1974, however, must be

regarded as nugatory for the purposes of the instant case.

Therefore, it is ordered as follows:

1. The Writ of Habeas Corpus is granted, effective forthwith.

2. The Clerk shall transmit a copy of this Order to the Petitioner, the Respondent, and the United States Attorney by United States mail.

## APPENDIX

### REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN FEDERAL CUSTODY

This Report and Recommendation is submitted to the Honorable Irving Hill, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(3) and General Order No. 104 of the United States District Court for the Central District of California.

Petitioner filed a petition for a writ of habeas corpus under Title 28 U.S.C. § 2243, challenging the action of the Parole Board in rescinding a parole release date of June 12, 1974.

A Return was filed by the respondent, and a Traverse was filed by petitioner represented by the Federal Public Defender of this District. Subsequent to the filing of the petition, petitioner was granted a further hearing by the Parole Board, which set a new release date at December 16, 1974.

The grounds upon which petitioner relies are as follows:

a. Petitioner was denied his due process rights in the rescission of his parole release date of June 12, 1974.

b. By reason of that violation, petitioner's continued incarceration beyond the June 12, 1974 release date originally set is unlawful.

### RECOMMENDATION

It is recommended that a conditional writ of habeas corpus be issued requiring the immediate release of the petitioner on parole unless, within 15 days

following the entry of the order granting the writ, petitioner is afforded a hearing on the question of rescission of the June 12, 1974 parole release date, in accordance with the due process requirements found to be applicable hereinabove.

Dated: December 3, 1974.

S/Ralph J. Geffen
RALPH J. GEFFEN
United States Magistrate

## SUPPLEMENTAL REPORT AND RECOMMENDATION

Attached are a copy of my order, and the response of the respondent, on the the issue of what elements of procedural due process were afforded the petitioner in each of the three prison disciplinary incidents upon which the Parole Board rescinded the previously specified future release of petitioner on parole.

The Government now concedes in detail that none of the proceedings was conducted in accordance with the basic due process requirements which you declared must be met, at either the prison disciplinary stage or at the time of parole rescission (your Order, dated December 10, 1974, p. 3).

It was your conclusion that, in the absence of a showing that these minimal requirements had been afforded in the prison as to any of the incidents, the writ of habeas corpus should issue (your Order, p. 5).

DATED: January 30, 1975.

S/ Ralph J. Geffen
RALPH J. GEFFEN
United States Magistrate

## FINDINGS OF FACT

1. Prior to May 15, 1974, petitioner was incarcerated at the Federal Correctional Institution at Terminal Island, California, pursuant to a conviction suffered in this Court of concealment and sale of illegally-imported narcotics. The commitment date was December 16, 1968 and the sentence was for an indefinite period of time not to exceed ten years.

2. On May 15, 1974, the United States Board of Parole issued a notice of action which set a parole release date of June 12, 1974 for petitioner, without provision for reference to a community release center.

3. On April 18, 1974, petitioner was involved in an altercation with a staff member at the prison, and on April 22, 1974 an incident report was filed in which the staff committee determined that he had refused an order by a staff member.

4. On April 24, 1974, an incident occurred in which petitioner was charged with insolence toward a staff member and refusal to obey an order of a staff member. This incident resulted in an incident report in which petitioner was found to have committed the prohibited acts charged; this incident report was filed on April 26, 1974.

5. On May 16, 1974, petitioner was involved in an altercation with a staff member which resulted in his being found guilty of the charges of refusal to obey an order of a staff member and insolence toward a staff member; this incident report was dated May 17.

6. No hearing was accorded in connection with the making of these incident reports and the determination by the staff that he was guilty of the charges, except that in each case petitioner was advised of the charges and allowed to affirm or deny them, and to tell his story.

7. These incident reports were reported to the Parole Board. Based on this information, the Parole Board notified authorities at Terminal Island by telephone on June 11, 1974 that the petitioner was not to be released on June 12, 1974, as previously scheduled, and pursuant to that oral notice petitioner was not released on June 12, 1974, or thereafter.

8. On June 18, 1974, the Board of Parole issued an order setting a progress hearing in petitioner's case for October 19, 1974.

9. On July 26, 1974, a second order was entered scheduling an institutional hearing on parole at Terminal Island in August, 1974, on the next regular docket. Advised thereof, the Magistrate deferred further proceedings in order to give the respondent an opportunity to correct any deficiencies in the procedures up to that date, and directed the United States Attorney to report upon that hearing to the Court not later than August 10, 1974.

10. By response filed with this Court on August 29, 1974, the United States Attorney advised that he had been informed of the following:

(a) That on August 15, 1974, a parole hearing was held for petitioner.

(b) That the United States Parole Board had set a new release date of December 16, 1974, petitioner to be released through a community treatment center.

(c) That upon receipt of formal notice of the action of the Parole Board, petitioner would be transferred to a community treatment center.

11. That the setting of a parole release date confers immediate tangible benefits upon an inmate as follows:

(a) It sets in motion the procedure under which the probation officer may visit the inmate, assist the inmate in providing a parole release plan, including assistance in job placement or training, housing, education and/or counseling services, and the probation officer is required to approve the parole release plan.

(b) Once a parole release date is set for an inmate incarcerated at Terminal Island, he can be furloughed to a community treatment center at any time within 90 days of that release date.

(c) An inmate having a parole release date may participate in work furlough programs and educational furlough programs, not previously available to him.

(d) The inmate is placed in a pre-release guidance program which includes counseling and assistance with job placement, duties and obligations of parole, and the requirements of after-care programs, if applicable to him.

12. No hearing was provided to petitioner at the time of rescission of his initial parole release date of June 12, 1974.

13. At the time of the setting of his new parole release date, petitioner was not allowed to challenge the accuracy of the incident reports which were part of the file of the Parole Board, nor was he allowed to be represented by counsel. The Board advised petitioner's attorney that an attorney could be present but could not participate in the proceedings except to make a summary statement at the end thereof. Petitioner's counsel was not able to be present on the dates set and a request for continuance to another date was refused. The hearing was conducted in the absence of counsel.

## DISCUSSION OF APPLICABLE LAW

There is no controlling law either by the U.S. Supreme Court or by the Ninth Circuit Court of Appeals, as to the requirement of due process in rescission of a parole release date. There is only the case of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) in which the Supreme Court held that minimal standards of due process were required before a parolee in the community could be deprived of the conditional liberty which had already been granted to him, by revocation of his parole. In Gagnon v. Scarpeli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Court held that minimum due process requirements also must attend the revocation of probation status already enjoyed.

In this District there is at least one decision, Batchelder v. Kenton, 383 F. Supp. 299, in which the District Court has held that the requirement of due process specified in Morrissey v. Brewer, *supra,* was equally applicable in the case of a rescission of a parole release date. In that case the parole release date was rescinded due to pending crimi-

nal charges relating to conduct which had occurred in the prison confines. That case is different factually from the instant case in some other respects, particularly in that the initial suspension of the release date in *Batchelder* was taken by action of a "board of the Bureau of Prisons," rather than the Parole Board; the Parole Board did not rescind the parole grant until one month following the release date which had been previously set. The Parole Board subsequently held a review hearing at which it ordered the prisoner to continue to serve the remainder of his sentence. The rationale of the Court was that a "release-date system for parole ascribes a status to the potential parolee" in the nature of an interest in his future liberty. For an incarcerated prisoner, the Court said, this status involves more than just a mere anticipation or hope of freedom; "it is a recognition of an accomplishment." Revocation of a status might involve many more years in prison; the fact that revocation of a release date became part of a prisoner's record might "mar his future chances for parole." Hence the interest created by a parole release date "must be viewed as 'substantial.'" The Court referred on this point to Sexton v. United States, 352 F.Supp. 147 (N.D.Tex.1972).

The District Court felt that once a subjective analysis of the prisoner's progress in the correctional process had been made and a decision reached to release him on a particular date, the petitioner "had obtained a level in the parole hierarchy, and was promised liberty at a certain time." This interest in his future liberty was subsequently rescinded on the basis of "a wholly retrospective factual question", i. e., whether the prisoner had in fact acted in violation of one or more conditions of this parole status.

It was the conclusion of the District Court that the prisoner was entitled to a fair hearing on the factual question as to whether he did in fact violate the prison regulations as reflected in the incident reports. "Because the nature of the inquiry here is nearly identical to that of a normal parole-revocation, and because the interest in conditional liberty is in many ways as valuable and will inflict a similar 'grievous loss' if terminated, the same procedures and rights should be ensured. In addition, it is clear that because the major focus of the inquiry is a factual one into an alleged serious infraction, and because the purpose of requiring a hearing is to afford adequate confrontation and cross-examination of the prisoner's accusers, petitioner must also be allowed to have assistance of counsel."

In Sexton v. Wise, *supra*, cited by the District Court in *Batchelder, supra,* the District Judge had held that *Morrissey* controlled and required a hearing. However, upon review, the 7th Circuit Court of appeals reversed. Sexton v. Wise, 494 F.2d 1176 (7th Cir. 1974). The Court stated, "Notice of a future date for release on parole, however, does not bestow upon the intended parolee a right to that parole prior to final physical release by the Bureau of Prisons. Before a prisoner can be officially paroled, the final step of physical release must be taken." *Supra,* at 1178.

"While a prisoner remains in the custody of prison officials, he continues to be subjected to their supervision and the wide discretion of the Board of Parole. The Regulations are clear that until final physical release occurs, the Board does not relinquish its broad discretionary powers to rescind any future parole." *Id.*

The Court noted the provisions of 28 C.F.R., § 2.20, which provides as follows:

"2.20 Release; Discretionary Power of Board.

"When an effective date has been set by the Board, release on that date shall be conditioned upon continued good conduct by the prisoner and the completion of a satisfactory plan for his supervision. The Board may, on its own motion, reconsider any case prior to release and may reopen and advance, postpone, or deny a parole

which has been granted. The Board may add to or modify the conditions of parole at any time."

The choice may be seen as between treatment of rescission as part of the process of release on parole (involving consideration, conditional grant, release) or, in the alternative, regarding it as the withdrawal of an additional increment of liberty which the prisoner acquires immediately upon the fixing of a conditional release date.

The granting of parole is a matter in which the greatest degree of discretion is vested in the Parole Board. The courts have traditionally abstained from interposing due process requirements in proceedings involving consideration of parole [Scarpa v. U. S. Board of Parole, 477 F.2d 278 (5th Cir. 1973)], but even this position has been questioned in recent date [see Barradale v. U. S. Board of Parole, 362 F.Supp. 338 (M.D.Pa. 1973)].

Petitioner's position is supported by the decision of the California Supreme Court in In Re Prewitt, 8 Cal.3rd 470, 105 Cal.Rptr. 318, 503 P.2d 1326 (1972), in which it was held that an order revoking a grant of parole prior to release of the inmate *was* subject to the due process requirements established by *Morrissey* for revocation of parole. There the Court said, ". . . we can perceive no significant distinction between the deprivation of the right to conditional liberty enjoyed by a parolee after release and the deprivation of the right to achieve such liberty after a grant thereof but before the date fixed for release. In either event the parolee has been deprived of a valuable if limited right to be free . . ., and the same or substantially the same protection must be accorded him in effecting that deprivation. An inmate, accordingly, is entitled to a hearing which substantially conforms to the *Morrissey* procedures on the question whether an order granting parole should be rescinded as improvidently granted." *Supra*, at 474, 105 Cal.Rptr. at 322, 503 P.2d at 1330.

In discussing the status of a parolee, the United States Supreme Court said in *Morrissey*, "implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole." *Morrissey, supra* 408 U.S. at 479, 92 S.Ct. at 2599. The Court also noted the effect upon the prisoner of being deprived of parole status. "If a parolee is returned to prison, he usually receives no credit for the time 'served' on parole. Thus, the returnee may face a potential of substantial imprisonment." *Supra*, 408 U.S. at 480, 92 S.Ct. at 2600.

[In contrast, one who has not yet been released on parole does not, *per se*, have his ultimate service date extended because of the failure to credit time spent on parole, since he has not, in fact, been in parole following the setting of his conditional release date.]

"Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restriction," the Court said, *supra*, 408 U.S. at 480, 92 S.Ct. at 2600. In contrast, rescission deprives a prisoner not of "conditional liberty" but of a conditional promise of liberty.

As to whether the requirements of due process in general should apply to parole revocation, the Court said, "The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Morrissey, supra*, 408 U.S. at 481, 92 S.Ct. at 2600.

Examining the nature of the interest of a parolee in his continued liberty, the Court pointed out that the liberty of the parolee enabled him to do a wide range of things open to persons who have never been convicted of any crime, such as gainful employment, freedom to be with family and friends, and freedom to form "the other enduring attachments of nor-

mal life." "Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked." *Morrissey, supra* 408 U.S. at 482, 92 S.Ct. at 2601.

This emphasis on the status of one already released to the community contrasts strongly with the mere expectation of a prisoner with a conditional release date that he will receive such status.

"We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege'. By whatever name, the liberty is valuable and must be seen within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal." *Morrissey, supra*, 408 U.S. at 482, 92 S.Ct. at 2601.

It is significant that the Court itself contrasted the actuality of liberty on parole with the mere expectation of that liberty, quoting from United States ex rel. Bey v. Connecticut Board of Parole, 443 F.2d 1079, 1086 (2nd Cir. 1971):

"It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom." *supra,* at 1086.

The nature of a constitutional interest in liberty which demands due process

protection was further discussed by the Supreme Court in the recent case of Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L.Ed.2d 935, 1974, 3 Prison L.Reptr. 189. The particular context of the Court's discussion was a class action by a prisoner under 42 U.S.C. § 1983, challenging prison rules and regulations, particularly the lack of procedural due process in disciplinary proceedings leading to revocation of good time credit for serious misconduct. Since the state created the right to good time credits and recognized that its deprivation was a sanction authorized in case of misconduct, the interest of a prisoner in retaining credits already earned by past conduct had real substance and was sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to ensure that the state-created right was not arbitrarily abrogated, the Court held:

"Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior had occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed."

It proceeded then to delineate the minimum due process which must be afforded in disciplinary proceedings of the type involved in *Wolff,* specifically holding that it was less than the broader framework applicable to parole revocation proceedings (cf. *Morrissey*).

This issue is one which will undoubtedly engender considerable controversy and difference of opinion among the courts until it is finally put to rest by decision of the Supreme Court of the United States. It is my opinion that the act of rescission of a parole release date in the federal system does cause a "grievous loss" to the petitioner, and deprives him of a significant interest in liberty. As the Ninth Circuit Court of Appeals quoted in Cluchette v. Procu-

nier, 497 F.2d 809, 815 (Ninth Circuit, 1974), 3 Prison L.Reptr. 121, "But, to determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." [quoting Board of Regents v. Roth, 408 U.S. 564 at 570–571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), which cited Morrissey v. Brewer].

> "That is, we must see if the prisoner's interest affected is within the Fourteenth Amendment's protection of liberty and property . . .; for any prison disciplinary proceeding that impairs a prisoner's residuum of liberty or adversely affects his property interest (and which is not de minimis) condemns a prisoner 'to suffer grievous loss,' as that term is now understood." *Cluchette, supra.*

Speaking of the determination by prison authorities that a prisoner had violated prison rules, the *Cluchette* Court said, "Any entry in a prisoner's permanent file which indicates that he has been found guilty of a violation of prison regulations, whether or not the file is forwarded immediately to the Adult Authority, has an incalculable effect on a prisoner's eligibility for parole . . ., an effect which without question impairs a prisoner's interest in 'liberty'."

The latter quote comes very close to suggesting that eligibility for release on parole is a part of a prisoner's remaining interest in liberty. From this, it can be deduced that rescission of a release date is the withdrawal of a conditional promise of liberty, and therefore, is a deprivation of that interest in liberty. If that be true, some due process would certainly be required for the Board to so act. Section 2.20 provides that release on the date set by the Board is "conditioned upon continued good conduct by the prisoner and the completion of a satisfactory plan for his supervision. The board may, on its own motion, reconsider any case prior to release and may reopen in advance, postpone, or deny a parole which had been granted." 28 C.F.R., § 2.20.

Hence it appears that the setting of a parole release date is a promise of release upon that date, subject to only two conditions: (a) continued good conduct by the prisoner and (b) completion of a satisfactory plan for his supervision on parole. That being so, an interest in liberty not previously enjoyed by the prisoner has been created, once the parole release date has been set; this is more than the mere anticipation of liberty implied by the existence of the parole system itself. If the promise is not to be kept, it must be because one of the conditions has failed. The new and conditional interest in liberty created by the setting of a parole release date is entitled to be protected by some degree of due process in the determination of whether either of the conditions has been violated so as to justify a rescission of the parole release promise.

This requires a consideration of what due process protections are appropriate for consideration of the rescission of a parole release date in the federal system.

> "It is now axiomatic that the requisites of due process vary according to specific factual contexts. . . . Fashioning the due process formula for each situation requires striking an appropriate balance by identifying and assessing the relative weights of the competing individual and state interests involved." Cluchette v. Procunier, *supra* 497 F.2d at 816. (1974 opinion).

It is not necessarily the full panoply of due process rights due in a criminal prosecution, or even in revocation of parole status already enjoyed in the community, which must be afforded in this situation. The weight of liberty involved here is less than that enjoyed by one who is already out of prison among his family and friends and in the job market. *Morrissey* held that the follow-

ing were required at a revocation hearing:

(a) a written notice of the claimed violation;

(b) disclosure to the parolee of evidence against him;

(c) opportunity to be heard in person and to present witnesses and evidence;

(d) confrontation and cross-examination;

(e) a mutual and detached hearing body such as a traditional parole board;

(f) a written statement by the fact-finders as to the evidence relied on and reasons for revoking parole. Morrissey v. Brewer, *supra*, 408 U.S. at 487–490, 92 S.Ct. 2593.

In the context of a parole release procedure, where the question is the continuance of good behavior or the ability to work out a suitable release program for supervision, it would seem that something more akin to the due process requirements in prison disciplinary hearings would be more appropriate. In Wolff v. McDonnell the Supreme Court asserted that while it adhered to the principles that the need was to strike a balance between the precise nature of the government function involved and the private interest at stake, the peculiar circumstances and pressures of intraprison affairs provided a substantive background against which the Due Process balance must be decided. The Court declined to hold that all of the *Morrissey* due process requirements applied in prison disciplinary proceedings and held that only the following were constitutionally mandated:

(a) advance written notice of charges;

(b) a written statement by the fact-finders of the evidence relied on and the reasons for their actions;

(c) the inmate should be allowed to call witnesses and present documentary evidence in his defense "when permitting him to do so will not be un-duly hazardous to institutional safety or correctional goals."

It is noted that these requirements were held sufficient in the context of disciplinary proceedings for *serious* misconduct involving forfeiture of good time credits.

It would appear that the *Wolff* due process *minima* would be appropriate to consideration of the rescission of a previously-determined parole release date. No weightier interest is at stake in the rescission of a release date than for deferral of a tentative discharge date through loss of credits on sentence.

Respondent has conceded at oral argument that petitioner was not afforded the minimal *Wolff* due process rights, either in disciplinary proceedings or in parole rescission proceedings. The records of prison administrative proceedings reflect the following. As to the May 16, 1974 incident, a copy of the incident report was given to the petitioner on the same date, and petitioner appeared before the disciplinary committee and denied the charges; a copy of the report, showing that the committee found him guilty on May 17, 1974 upon the basis of the report was offered to petitioner and refused. As to the April 18, 1974 incident, a copy of the incident report was delivered to the petitioner on April 19, 1974. He was found guilty on April 22, 1974, but the report reflects neither that he was present, nor what proceedings were had, nor upon what the committee based its finding. As to the April 24, 1974 incident, a copy of the incident report was given to the petitioner on that date, he appeared before the committee and denied the report without further comment, and the committee found him guilty upon the basis of the report. Upon the last-mentioned occasion, he was disciplined by withdrawal of ten days statutory "good time" credits.

It is clear that the Parole Board rescinded petitioner's parole release date solely on the basis of the report from the respondent of the three incident re-

ports, without affording petitioner prior notice of any kind, or any opportunity to challenge the accuracy of the reports.

### CONCLUSIONS OF LAW

1. Petitioner was deprived of a significant interest in liberty by virtue of the rescission of his parole release date of June 12, 1974.

2. Petitioner was deprived of his rights under the Fifth Amendment when he was deprived of such liberty without due process of law in the form of minimum procedural due process; the minimum due process to which he was entitled consisted of advance notice of the basis for reconsideration, an opportunity to present witnesses and evidence in his behalf in refutation of the stated grounds, and notice of the evidentiary basis of the decision to change his parole release date after it had already expired, together with a brief but reasoned explanation of the decision.